J-S02040-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| ROBERT J. MCBREARTY | : | |
| Appellant | : | No. 1416 EDA 2017 |

Appeal from the PCRA Order April 4, 2017
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-0001058-2010

BEFORE:   BOWES, J., NICHOLS, J., and RANSOM*, J.

CONCURRING MEMORANDUM BY BOWES, J.:        **FILED JUNE 26, 2018**

In this PCRA appeal, Robert J. McBrearty raises several ineffective assistance of counsel claims. I agree with my learned colleagues that we may deem these claims waived because they are underdeveloped and improperly pled. However, I find it preferable to decide the issues on their merits as Appellant's core claim of trial counsel ineffectiveness is, despite those defects, discernible. For that reason, I concur in the result reached by the Majority.

With respect to the ineffective assistance of trial counsel claims, I believe that trial counsel ably represented Appellant in pursuing a claim that his confession was obtained in violation of ***United States v. Miranda***, 384 U.S. 436 (1966), and therefore had a reasonable strategic basis for failing to pursue the alternative suppression basis discussed in the PCRA petition. Additionally, I find that Appellant has failed to plead and prove his claim of appellate counsel ineffectiveness. Critically, Appellant has not established

_____
* Retired Senior Judge assigned to the Superior Court.

that a proper presentation of the **Miranda** claim would have succeeded on direct appeal. My reasoning follows.

A major factor in this case is our prior memorandum deeming waived the sole appellate argument. Thus, I begin with a review of the facts, as set forth in that decision.

> Prior to the charges being filed in the present case, Appellant pled guilty to Driving Under the Influence in Montgomery County and had been under the supervision of [Parole Officer Glenn Sherman] since July of 2009. On December 21, 2009, Officer Sherman met with Appellant in the Adult Probation and Parole Office located in the Bucks County Courthouse in Doylestown, Pennsylvania. The meeting, which lasted approximately fifteen to twenty minutes, took place in a 10'x15' conference room which had a table and chairs in the middle of the room, video conferencing equipment, and a telephone. When the meeting concluded, and after Officer Sherman scheduled their next appointment, he asked Appellant whether he would be willing to speak with Detective [Lance] Carlen of the Doylestown Borough Police Department. Appellant said that he would be willing to speak with Detective Carlen. After Appellant agreed, Officer Sherman allowed Detective Carlen to enter the conference room.

> Detective Carlen was in plain clothes and was not carrying his firearm at the time of the meeting. He sat at the end of the table in the seat closest to the door between Officer Sherman and Appellant. Throughout Detective Carlen's two (2) hour interview of Appellant, the door to the conference room was open six inches to one foot, Appellant moved freely about the room, never asked to use the restroom, or to stop the interview. Officer Sherman remained in the room during the interview with the exception of a period of approximately fifteen to thirty minutes when he left to reschedule clients who he was supposed to see that day. Prior to commencing the interview, Detective Carlen told Appellant that he was not in nor was he going to be taken into custody, and that Appellant did not have to speak with him. Detective Carlen did not read the **Miranda** warnings to Appellant. Detective Carlen testified that Appellant did not ask for an attorney at any point during the interview.

- 2 -

When the interview began, Detective Carlen informed Appellant that his purpose was to question him about the recent fires in Doylestown. Initially, Appellant denied having any knowledge of the fires. It was only after Detective Carlen explained the nature and locations of the fires, noted that Appellant had been stopped by police on several occasions in connection with those fires, and presented evidence of his connection to them, that Appellant admitted that he knew about the fires and had been stopped and questioned by police investigators. In an effort to help Appellant conceptualize the timeline and locations of the fires, Detective Carlen drew a map indicating where certain fires had been set near the James Lorah house. Appellant admitted to Detective Carlen that he set the fire to the fence behind Finny's Royal Grotto and to leaves at the James Lorah house; Appellant made pen marks on the map indicating where he had started the fires. Appellant denied involvement in the fires at Union Station and behind the Doylestown Fire Station.

As the interview progressed, Detective Carlen wrote all of the locations and dates down on a piece of paper and asked Appellant if he would be able to confirm whether he did or did not start the fires. In confirmation that he'd started two of the fires, Appellant wrote "leaves between two buildings" next to the James Lorah house entry, and "fence" next to Finny's Royal Grotto to mark where the fires began. He put an "X" and "no" next to the Union Station and Shewell Avenue locations to indicate that he did not start those fires. Detective Carlen went through thirteen (13) fires on the list, Appellant wrote "yes," "no," or "possible" next to each location and signed the document underneath the detective's signature. Detective Carlen told Appellant that he could be prosecuted for each of the thirteen fires separately or as one offense on a "common scheme prosecution" and that anything he did on the day of the interview would help him in regards to the prosecution of the offense. Additionally, Detective Carlen told Appellant that it would be beneficial for him if he continued to be "forthcoming" with information regarding the fires. Appellant did not change his answers regarding the fires after this statement was made by Detective Carlen. When the interview concluded, Detective Carlen told Appellant that he was not going to arrest him until after the holidays when they would proceed with prosecution of the arsons. Appellant was permitted to leave the courthouse without any interference from Detective Carlen or Officer Sherman.

. . . Appellant testified that, although the detective told him that he was free to terminate the interview and leave at any time, he did not believe he was allowed to do so because he believed it would "violate [his] relationship with [his] probation officer." On cross-examination, Appellant admitted Officer Sherman did not tell him that he had to speak with Detective Carlen, would violate his probation if he did not talk to the detective, and did not tell him that he was not permitted to end the interview at any time. Appellant stated that he asked for an attorney during the interview. Appellant accused Officer Sherman and Detective Carlen of lying about whether he asked for an attorney, the reason for Officer Sherman leaving the conference room during the interview, and the length of the time that Officer Sherman was absent from the room. The testimony of Detective Carlen and that of Officer Sherman directly contradict these allegations.

*Commonwealth v. McBrearty*, 1381 EDA 2011 (Pa.Super. 2012), at 1-4 (quoting trial court opinion) (footnote and citations omitted, alterations in original).

The trial court denied Appellant's motion to suppress his statements. Appellant proceeded to a non-jury trial, and was convicted of, *inter alia*, arson, and sentenced to four to eight years incarceration, followed by a consecutive period of seven years probation. He was also ordered to pay more than $900,000 in restitution. Appellant did not file post-sentence motions. He filed a timely notice of appeal raising the following issue:

Did the trial court err by denying [Appellant's] motion to suppress evidence, namely, [Appellant's] incriminating statement insofar as the statement had been made without [Appellant] having been advised of his **Miranda** rights, had been made by reason of coercion by the police threatening to bring additional charges against him, and had been made by reason of inducement by the police promising **not** to bring additional charges against him?

*Id*. at 5 (quoting brief, emphasis and alterations supplied by Superior Court).

- 4 -

We deemed this claim waived. As it relates to these proceedings, we noted that the pre-trial motion to suppress was based on a purported violation of **Miranda**. However, while Appellant cited **Miranda** in his brief, our memorandum noted that his substantive argument did not rely on the absence of those warnings:

Appellant attacks the voluntariness of the admissions that he made to Detective Carlen. Appellant points out that he was not provided **Miranda** warnings prior to making the inculpatory statements. However, Appellant does not presently argue that his statements should be suppressed due to that omission. **Rather, he contends that the statements were the product of coercion through the use of improper promises and inducement**. Appellant asserts that Detective Carlen induced his confession by making both express and implied promises that the authorities would "go easier" on him if he confessed and that they would not file attempted homicide or manslaughter charges against him if he was "forthcoming." Additionally, Appellant points out that he never was informed that he was free to leave or that he could terminate the interview at any time. Finally, Appellant notes that, during the interview, he never was offered a break, a drink, a snack, or a visit to the bathroom. Because of these promises and deprivations, Appellant argues that his inculpatory statements were involuntary, and therefore inadmissible.

. . . .

[At the trial court level,] Appellant did not claim that he was improperly induced into confessing through promises for leniency and/or promises not to file particular charges. . . . Appellant informed the court that he would only advance the suppression issue contained in the motion, *i.e.*, the **Miranda** issue. He did not attempt to amend the motion orally, or otherwise preserve the issues he now raises.

*Id*. at 6-7 (emphasis added, citation omitted).

Before discussing the instant PCRA proceedings, I briefly review the differing legal theories involved in the pre-trial motion versus those pursued

on direct appeal. As noted in our prior decision, the motion to suppress was based on **Miranda**. In **United States v. Patane**, 542 U.S. 630 (2004), Justice David Souter summarized **Miranda** as follows:

> **Miranda** rested on insight into the inherently coercive character of custodial interrogation and the inherently difficult exercise of assessing the voluntariness of any confession resulting from it. Unless the police give the prescribed warnings meant to counter the coercive atmosphere, a custodial confession is inadmissible, there being no need for the previous time-consuming and difficult enquiry into voluntariness.

**Id**. at 645 (Souter, J., dissenting). Thus, the failure to warn requires suppression of statements made during a custodial interrogation, regardless of whether the statement was actually involuntary within the meaning of the Fifth Amendment. **See Oregon v. Elstad**, 470 U.S. 298, 306–07 (1985) ("The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer **Miranda** warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under **Miranda**.").

However, even in cases where a defendant is not subjected to custodial interrogation, a confession may still be involuntary under the Fifth Amendment standard. **See Commonwealth v. Nester**, 709 A.2d 879, 882 (Pa. 1998) ("In this case, Nester was not in custody when he confessed and he concedes that the warnings described in [**Miranda**] were not required here."). We

apply a totality of the circumstances test to determine if a noncustodial interrogation was involuntary:

> a noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, result in an involuntary confession. When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Id*. at 882 (quotation marks and citations omitted).

Trial counsel sought suppression based on the failure to issue *Miranda* warnings, and did not challenge the voluntariness of the confession based on the totality of the circumstances. Appellate counsel, on the other hand, argued that the confession was involuntary under the latter test. We deemed the claim waived, since the theory advanced on appeal was not advanced at the trial court level.

Appellant subsequently filed a *pro se* petition seeking PCRA relief. Counsel was appointed and filed an amended petition. Appellant raised several undeveloped claims and theories. The following passage is illustrative:

> It is uncontested that there were multiple factual, legal, and constitutional grounds for suppressing the alleged confession where there was no forensic evidence implicating Appellant in any way, yet there was not litigation and appellate review of these matters because trial and appellate counsel raised diametrically opposed claims without preserving all constitutional claims for Appellant. It is likewise uncontested that trial counsel did not wish for his client to be able to exercise his constitutional right to testify and trial counsel specifically crafted as short a direct examination as possible preempting Appellant from testifying about the issues

he had previously and specifically mentioned to trial counsel. It is also uncontested that trial counsel did not conduct the investigation of the evidence and records requested by Appellant to support his diminished mental capacity, supporting his account of the coercive nature of the interrogation and impeaching any of the Commonwealth's witnesses. Taken together, it is clear that for the following reasons, trial counsel provided ineffective representation of counsel on issues that involved arguable merit without a shared or consulted reasonable basis that prejudiced Appellant by waiving suppression, trial, reconsideration, and appellate issues resulting in possibly a wrongful conviction and sentence of excessive period of probation whenever he ultimately is released.

The ineffective assistance of counsel individually and/or jointly occurred through the lack of investigation, case preparation, consultation, advice with client, preparing, litigating and ultimately waiving suppression issues, as well as undermining, limiting and essentially preventing the exercise of his right to testify. This was further compounded by the lack of any meaningful advice or discussion regarding the differences between a waiver trial, stipulated waiver trial, and a jury trial, the ability to present defense evidence, preserving post–sentence rights, as well as failing to preserve, litigate, and address issues pre-trial, at trial, and on direct appeal. Simply put, the above errors by all counsel denied Appellant his constitutional protections, rights, and due process, thereby constituting ineffective assistance of counsel so significant that it undermined the truth-determining process so that no reliable adjudication of guilt or innocence could have taken place resulting in the possible conviction of an innocent man.

Appellant's brief at 14-15.

Confusingly, Appellant claims that these errors failed to "preserve Appellant's substantive due process rights to present a meaningful defense[.]" *Id*. at 14. As is evident from the aforementioned arguments, Appellant elected to litigate several claims of ineffectiveness, which the Majority finds underdeveloped. I agree that Appellant's presentation of these claims is lacking, but I would address the gravamen of his petition: the claim that trial

counsel ineffectively failed to investigate and produce evidence that his statement was involuntary under the totality of the circumstances. We apply the following standard to such claims.

> The law presumes counsel has rendered effective assistance. When asserting a claim of ineffective assistance of counsel, the petitioner is required to plead and prove: (1) the underlying claim has arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

*Commonwealth v. Moriarty*, 180 A.3d 1279, 1285 (Pa.Super. 2018) (citation omitted).

I submit that we may dispose of the majority of Appellant's claims by assessing whether the decision to pursue a *Miranda* suppression motion had a reasonable strategic basis.[1] I would hold that there clearly was, based on

---

[1] A consistent theme in Appellant's brief is that counsel failed to properly consult with him regarding the wisdom of pursuing suppression based on *Miranda*. "[W]ithout consulting with Appellant, trial counsel withdrew half of the constitutional bas[e]s for said claims in advance of said hearing." Appellant's brief at 7. However:

> [T]he decision to litigate, or not litigate, suppression motions is left to counsel in the exercise of his or her professional judgment. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, where counsel fails to file a suppression motion, a prejudice analysis is unnecessary so long as there was a reasonable strategic basis for failing to file the motion.

the factual circumstances surrounding Appellant's probation meeting, the request to speak to Detective Carlen immediately following that meeting, and the fact that the probation officer was present for most of the interview. Furthermore, the PCRA evidentiary hearing demonstrates that trial counsel consciously chose not to pursue the unpreserved grounds. Trial counsel testified that he only litigated the motion to suppress based on **_Miranda_**:

> [THE COMMONWEALTH]: And why was that?
>
> [Trial counsel]: Because I thought that that was the best motion to litigate. I thought there was a unique set of facts and circumstances that would lead a reasonable person to perhaps believe that [Appellant] was in custody during the time that that statement was taken.

N.T. PCRA Hearing, 5/9/16, at 16. On cross-examination by PCRA counsel, trial counsel explained his assessment of the merits of the motion:

---

> The upshot of these principles is that where a defendant alleges that counsel ineffectively failed to pursue a suppression motion, the inquiry is whether the failure to file the motion is itself objectively unreasonable, which requires a showing that the motion would be meritorious. **_See Commonwealth v. Melson_**, 383 Pa.Super. 139,556 A.2d 836, 839 (1989) ("Where the challenge is to a failure to move for suppression of evidence, the defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable.").

**_Commonwealth v. Johnson_**, 179 A.3d 1153, 1160 (Pa.Super. 2018) (footnote omitted). **_see also Gonzalez v. United States_**, 553 U.S. 242, 249 (2008) ("Giving the attorney control of trial management matters is a practical necessity. The adversary process could not function effectively if every tactical decision required client approval.") (quotation marks and citation omitted).

[Trial counsel]: Well, first of all the interview took place in the Bucks County Adult Probation Office. [Appellant] was brought in for his regular visit. And somehow the Doylestown Police Department found out about that and had made arrangements to be present at the probation office when [Appellant] met with Mr. Sherman.

As I recall the testimony, the sergeant was in another room across the hall, and once the interview was concluded by Mr. Sherman, [Appellant] was asked would he hang around so the police could talk to him.

What I found particularly coercive about that setting not only was where it took place, but Mr. Sherman remained in the interview the entire time but for what he testified to be about a five-minute break where he had to make a phone call. I think the detective sergeant said he may have been out of the interview a little longer than that. But for an overwhelming majority of the two-and-a-half-hour interview, another factor that went to this coerciveness, his probation officer is sitting right next to him.

So having had a lot of experience with people on probation from both sides of the aisle, I don't think people believe they have the right to leave because of the presence of their probation officer when he's present, despite being told to do so.

And so, therefore, I did not think [Appellant], or a reasonable person in [Appellant]'s shoes, would believe that he had the right to leave. And I thought that that was a very coercive setting, and they did not, admittedly, advise him of his **Miranda** rights. So my argument was that he was in custody, and that the statement was involuntary.

*Id*. at 36-38.

- 11 -

With respect to the various materials that Appellant asserts should have been introduced in support of his motion to suppress, trial counsel opined on cross-examination that those materials were irrelevant:

Q. You are aware now that [Appellant] had records at the Bucks County Correctional Facility, Council Rock School District, and Children's Hospital of Philadelphia, correct?

A. Correct.

Q. Did you take any steps to obtain those documents before trial?

A. No.

. . . .

I don't believe that what happened at Council Rock High School has any effect on what happened in this case. I believe it's completely irrelevant.

Q. So if somebody received special education, training, and support for numerous years, you believe that's completely irrelevant in your legal opinion?

A. Correct.

Q. You don't believe that it would establish a history of ongoing need and support to understand the difference processing issues?

A. Maybe, but not in this case.

*Id*. at 33-34.

Appellant now attacks the failure to procure and present those kinds of materials as follows:

**Trial counsel admitted that one's longstanding mental health history could be relevant to issues such as the voluntariness** of statement and to explain the Appellant's conduct, but nevertheless, counsel never asked nor sought readily available records regarding Appellant's mental health treatment,

- 12 -

eight years of special education, Bucks County Correctional Facility records, and Children's Hospital of Philadelphia records. Even though trial counsel had retained a mental health expert, he did not ask the expert regarding any issue regarding involuntariness. **Counsel, rather boldly proclaimed, that he strongly believed the statement [w]as involuntary and he declined to ask the expert this issue because, "I don't need him [an expert] to tell me that."** This failure to in any way investigate the foregoing records, undermined cross[-]examination, prevented rehabilitation of Appellant's credibility, and denied the fact finders of evidence that would corroborate the Appellant's account, namely video from the Bucks County Courthouse, interview logs, parole papers, rules and regulations, or measuring/demonstrating the size of the room where the two and one-half (2 1/4) hour interrogation occurred. The records submitted as part of the record clearly establish processing and other issues that would only further support this claim that counsel seemed so strong he did not even need to ask his already retained expert. When one's life is at risk, evidence and experts cannot be ignored or disregarded, but it was in this case, and the records submitted show why an expert was warranted and helpful to the defense.

Appellant's brief at 17-18 (emphases added).[2]

I do not find trial counsel's conclusion to be a "bold proclamation," as Appellant's ineffectiveness argument ignores the distinction set forth *supra* between involuntary due to the failure to issue **Miranda** warnings, and involuntary under the distinct totality of the circumstances standard. Counsel's concession that, *inter alia*, mental health records "could be relevant" was obviously referring to the latter standard. **Nester**, **supra** at 882 (listing,

_____

[2] Appellant also faults trial counsel for failing to review these records before filing the motions. However, Appellant fails to discuss how the substance of those records would have made any difference whatsoever. In other words, Appellant appears to advance a "failure to prepare" theory of ineffectiveness without explaining how he was prejudiced by those failures.

under totality of circumstances test, "the physical and psychological state of the accused . . . and any and all other factors that could drain a person's ability to withstand suggestion and coercion").  Appellant, however, appears to believe that counsel somehow conceded that those records were relevant to the *Miranda* inquiry.  Trial counsel correctly opined that those other factors were irrelevant if Appellant was in fact subject to custodial interrogation.  Therefore, I would hold that Appellant has failed to establish that trial counsel lacked a reasonable strategic basis in presenting the *Miranda* claim to the exclusion of the alternative claim.  "[W]e will conclude that counsel's chosen strategy lacked a reasonable basis only if the petitioner proves that the alternative strategy not selected offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Busanet*, 54 A.3d 35, 46 (Pa. 2012) (citation omitted).

Puzzlingly, Appellant appears to believe that *Miranda* warnings were, in fact, required.  It is not, of course, inconsistent to state that (1) Appellant was in custody and subjected to interrogation, therefore requiring *Miranda* warnings, and (2) that his statement was involuntary, even though *Miranda* warnings were not given.  However, as trial counsel recognized, there was simply no need to establish that the statement was **actually** involuntary if *Miranda* warnings were required.  That is precisely the point of *Miranda*'s

prophylactic rule.[3]  If Appellant continues to believe that he was subject to custodial interrogation, then his continuing insistence that trial counsel was ineffective makes little sense.

Having established that trial counsel had a reasonable strategic basis for focusing on the *Miranda* issue, the remaining question would be whether appellate counsel was ineffective for failing to pursue that issue.  However, Appellant has failed to properly plead and prove appellate counsel's

_____

[3] Appellant also raises issues regarding the Sixth Amendment right to counsel: "Appellate counsel only raised the voluntariness of the statement, and then waiving any appellate review of the Fifth or Sixth Amendment violations." Appellant's brief at 16.  Appellant fails to discuss the differences between these two Amendments.  *See McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991) (discussing Sixth Amendment right to counsel versus right to counsel under *Miranda*; "Petitioner relies, however, upon a different 'right to counsel,' found not in the text of the Sixth Amendment, but in this Court's jurisprudence relating to [*Miranda*].").

The source for this claim, it appears, is that Appellant testified at the suppression hearing that he had requested an attorney.  As trial counsel made abundantly clear at the evidentiary hearing, he feared that Appellant's testimony was not credible and urged Appellant not to testify, as the probation officer and the detective denied the assertion that Appellant requested an attorney.  More significantly, trial counsel believed that any invocation of counsel was irrelevant since the Commonwealth conceded that *Miranda* warnings were not issued.  According to the Commonwealth's theory, Appellant was not in custody, was free to leave, and therefore not entitled to counsel.  Appellant fails to explain why a preemptive request for counsel in a non-custodial interview must be honored. *See Commonwealth v. Morgan*, 610 A.2d 1013, 1018 (Pa.Super. 1992) (police officer read *Miranda* rights to non-custodial suspect and suspect thereafter requested counsel, which was not honored; "it is error for a court to consider a confession presumptively coerced merely because a request for a lawyer is not honored where, as here, the suspect was **not** in custody at the time.") (emphasis in original)

ineffectiveness, as a stand-alone claim regarding that attorney's failure to argue the correct legal theory to this Court on direct appeal. I would therefore find that Appellant has waived that discrete claim. *See Commonwealth v. Koehler*, 36 A.3d 121, 142 n.19 (Pa. 2012) ("A claim of appellate counsel ineffectiveness for failing to raise a claim of trial counsel ineffectiveness is distinct from the instant stand-alone claim of appellate counsel ineffectiveness grounded in the manner in which appellate counsel litigated a claim on appeal.").

Even if properly pled, I would find that Appellant failed to establish prejudice. The prejudice prong is not self-proving. Appellant is required to show that, had appellate counsel properly presented the *Miranda* argument on direct appeal, "a reasonable probability exists that the outcome of the appeal would have been different." *Commonwealth v. Thomas*, 44 A.3d 12, 17 (Pa. 2012). Functionally, that reduces to a question of whether this Court, on direct appeal, would have granted relief on the *Miranda* claim had counsel argued that issue.

Appellant's only argument in this respect is that his attorneys failed to cite *Commonwealth v. Cooley*, 118 A.3d 370 (Pa. 2015), and other cases for the proposition that his confession should have been suppressed. Appellant argues:

> In *Cooley*, the court concluded that Cooley was questioned regarding new criminal charges, that there was custodial interrogation and the failure to issue *Miranda* warnings violated his Fifth Amendment rights. Under *Cooley*, not only would

Appellant have been entitled to a suppression of the statement because it was so coercive, a legal and factual conclusion that would have been far easier to reach if trial counsel was not so ineffective, the court clearly indicated that the transition from typical parolee/parole officer conversations to one that translates to new criminal charges, at the very least required **Miranda** warnings. **Cooley**, **supra** at 78. (Indicating that in comes [*sic*] circumstances someone subject to custodial interrogation is entitled to a self-executing privilege against self-incrimination.)

. . . Pennsylvania is neither the first nor the last jurisdiction to have concluded that custodia[l] interrogation by parole or probation officers about new crimes requires **Miranda** warnings. The view about whether **Miranda** rights should be self-executing was specifically commented on in the case of **Minnesota v. Murphy**, 465 U.S. 420 (1984), unlike the instant case, the defendant did not believe that he would face any consequences for walking out of the interview. However, when a defendant believes that there are consequences, the right to remain silent may be self-executed. **Commonwealth v. Knoble**, 42 A.3d 976, 982 (Pa. 2012).

. . . .

The foregoing case law clearly sets forth that the record, even as it now exists, constitutes a violation of Appellant's **Miranda** rights which were not fully and fairly litigated on initial suppression and trial stages due to the ineffectiveness of trial counsel. It further exemplifies how the additional testimony and evidence regarding the circumstances of the room, the position of the actors, physical and video evidence, and Appellant's mental state were all highly probative and could have only aided in the defense and litigation of these issues if counsel had provided effective assistance of counsel.

Appellant's brief, at 21-23 (some citations omitted).

This quoted explanation serves as a proxy for Appellant's argument that he was prejudiced. However, his argument largely places the blame on trial counsel—as opposed to appellate counsel—and is little more than citation to

cases that might have been used to support a properly-developed argument. Therefore, I agree with the Majority that Appellant has waived this claim.

I would add, however, that *Cooley* is not directly on point, and is readily distinguishable. Therein, Cooley's parole agents received reliable information that Cooley possessed firearms and was selling drugs. One week after receiving this information, Cooley appeared for a scheduled parole meeting. Immediately upon arrival, Cooley was handcuffed and told that his home would be searched. He was transported to his home, still in handcuffs. *Miranda* warnings were not issued, and Cooley sought to suppress statements made during these events, which the trial court denied on the basis that Cooley was neither in custody nor interrogated. The *Cooley* Court concluded that, under the totality of the circumstances, "a reasonable parolee would not feel free to terminate the encounter and leave the parole office."

A detailed examination of *Cooley* is not necessary for present purposes. Suffice to say, this case does not involve the probation officer asking the questions, does not involve the use of physical restraints, and did not result in the authorities immediately confronting Appellant. Those facts alter the totality of the circumstances analysis applied in *Cooley*. *Id*. at 379 n.13 ("A court views the totality of circumstance in each case; we accordingly limit our holding to the facts presented here and recognize the outcome might be different with factual variations.").

Moreover, Appellant refers to the possibility that his rights were self-executing. That concept applies only if "the government in any way asserts that a probationer's claiming of the privilege would lead to probation revocation[.]" **Knoble**, **supra** at 982. Herein, Appellant was not put in the position where he had to choose between speaking to Detective Carlen, and refusing, thereby jeopardizing his probationary status. Thus, Appellant has failed to establish that a proper presentation of the **Miranda** claim would have resulted in relief on direct appeal.[4]

Next, Appellant asserts that trial counsel's ineffectiveness continued after suppression, as "trial counsel elected to proceed by way of a stipulated waiver trial. The record reflects that Appellant did not realize that he had the choice and believed that this decision was up to the attorney[.]" Appellant's brief at 24. The record reflects no such thing. Appellant cites to his own testimony at the PCRA hearing to support his argument. However, the transcript from the non-jury trial establishes that the trial court fully explained to Appellant that he had a right to a jury trial, and asked if he wished to waive that right. There is no support whatsoever for his claim that his trial attorney made the decision for him.

___

[4] Additionally, Appellant does not address the fact that **Cooley** was issued in 2015; his direct appeal was decided in 2012. Therefore, Appellant has failed to establish that he would have succeeded based on precedents existing at the time of his direct appeal.

Finally, Appellant's remaining claim asserted that trial counsel failed to file a post-sentence motion for reconsideration of his sentence. I would affirm denial on substantive grounds. Appellant alleges that a motion to reconsider should have been filed because his sentence exceeded the aggravated range of the guidelines at one of the counts. Trial counsel fully explained why he did not file that motion:

Q. Did you have any recommendations for him regarding filing a motion to reconsider?

A. I recommended he not.

Q. Why is that?

A. Well, for a couple different reasons. First of all, while any time in the state penitentiary is a long time in my eyes, I still thought the sentence was a very fair sentence given the facts and circumstances of this case. I mean, a home was pretty much burnt down. The people were home at the time. They escaped. Their five pets barely escaped, three of which, as I remember now, had smoke inhalation. I thought that was extremely egregious. The number of fires during a [thirty-one] day period, that was an excellent sentence in my book, number one.

Number two, certainly in this case but in most cases I find motions to reconsider to be exercises in futility. I mean, the judge gave a very reasoned explanation and analysis of why he was going outside of the guidelines. His reasons were on the record. I thought them to be valid. So from a common sense standpoint I'm going to come back now or somebody is going to come back in nine or ten days and say, oh, by the way, we want you to reconsider? I didn't think there was much value in the motion to reconsider.

And lastly, I made it clear to the family, I don't do appellate work.

. . . .

Q. Now, a couple things I want to clarify. You mentioned that the actual sentence in terms of looking at the guidelines for at least that one count was an aggravated range sentence or outside of

the aggravated range. How did you analyze that in terms of the overall nature of this case?

A. Well, clearly the judge could have given him – sentenced him on each count and made those sentences to run consecutive[ly], which would have been far worse than what [Appellant] received . . . the judge made it clear that he was sentencing [Appellant] to a – I don't remember whether it was an aggravated range or an outside-the-guidelines sentence but was not sentencing him on the other counts. I mean, listen, quite frankly, I left here very satisfied with that sentence.

N.T. PCRA Hearing, 5/9/16, at 27-29.

Therefore, trial counsel believed there was no arguable merit to the claim. Moreover, Appellant was not prejudiced by that failure as the PCRA judge, who sentenced Appellant, confirmed in his PCRA court opinion that he would not have revisited that sentence had the motion been filed. "In imposing a sentence in this matter . . . [t]his [c]ourt is satisfied that an appropriate sentence was imposed. . . .By failing to demonstrate that this [c]ourt would have granted a motion for reconsideration of sentence, PCRA counsel has failed to plead and prove that [Appellant] was prejudiced as a result of his counsel's failure to file post-sentence motions." PCRA Court Opinion, 7/20/17, at 13-14.

For the foregoing reasons, I concur in the decision to affirm the order dismissing the petition.

Judge Nichols concurs in the result.